IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

**PAUL ALBA, JR. #61319-080**  **PLAINTIFF**

**VERSUS**  **CIVIL ACTION NO. 5:10cv49- DCB-RHW**

**DELORES RANDLE,** *et al.*  **DEFENDANTS**

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' November 15, 2010 motion to dismiss or in the alternative, for summary judgment [66], and the *pro se* Plaintiff's response and supplemental pleadings and exhibits in opposition to the motion [78], [98], [99], [100] and [103]. Having reviewed the submissions of the parties, and the applicable law, and being fully advised in the premises, the undersigned recommends, for the following reasons, that Defendants' motion [66] be granted, and this case, dismissed.

### Facts and Procedural History

Paul Alba, Jr. is currently incarcerated in the Federal Correctional Institution (FCI) in Estill, South Carolina, serving a 151- month sentence imposed March 4, 2003 in the U.S. District Court for the Western District of Texas following his conviction of conspiracy to distribute heroin.[1]  His projected release date is April 6, 2014.  Alba filed this lawsuit April 2, 2010, alleging violation of his constitutional rights arising from a July 26, 2008 incident during his incarceration in the Federal Correctional Institution (FCI) in Yazoo City, Mississippi.  Alba was

---

[1] When he was sentenced, Alba was already imprisoned in Texas serving a 75-year state court sentence for robbery.

1

confined at FCI Yazoo City from January 7, 2008 until December 12, 2008 when he was transferred to a different prison.[2] [66, Ex. 2]

In his lawsuit, Alba named the following defendants: Delores Randle, Case Manager; Mike Morris, Unit Manager; Bruce Pearson, Warden; Delbert G. Sauers, D.S.S.C. Administrator Chief; Debra Dawson, S.I.S. Gang Intelligence Lieutenant; Jeremy Fuqua, S.I.S. Gang Intelligence Officer; and Ayanna Brown, Special Litigation Section P.H.B., Civil Rights Division.[3] Alba claims Defendants failed to protect him from an attack by fellow inmates on July 26, 2008. Alba, who has previously admitted being involved with the Texas Syndicate and bears tattoos identifying him as such, claims his assailants were members of the Sureños, Paisas and Texas Syndicate prison gangs. Alba contends the Defendants knew or should have known from his inmate file that he was subject to attack by such persons. For example, he refers to a January 2007 threat assessment done by prison officials at the United States Penitentiary (USP) at Hazelton, West Virginia while he was incarcerated there. The threat assessment concluded there was a threat to Alba's safety due to his membership in the Texas Syndicate and the enmity that existed between that gang and the Mexican Mafia/Sureños. The assessment stated, "there is a hit on site order between the Mexican Mafia/Sureños and the Texas Syndicate members,"[4] and recommended that Alba be kept in the Special Housing Unit (SHU) until he could be transferred to another facility, "due to the probability inmate Alba can not be safely placed in a BOP facility

---

[2]It appears that since September 2003, Alba has been incarcerated in federal facilities in Texas, Oklahoma, Florida, Georgia, West Virginia, Kentucky, Mississippi, Virginia and South Carolina. [66, Ex. 2]

[3]The titles of the defendants are those ascribed to them by Plaintiff in the complaint.

[4]Officer Berrios, who prepared the Hazelton assessment, also noted that during Berrios' previous assignment at USP Coleman in Florida while Plaintiff was incarcerated there, Berrios had intercepted "a phone call in reference to the Texas Syndicate placing a 'green light kill on site' on Alba." [146-2, p. 4] The records before the Court indicate Alba was at Coleman from October 7, 2003 until November 30, 2004. [66, Ex. 2]

or a State facility in the State of Texas."[5] [146-2, p. 4]  This document also reflects that when interviewed, Alba stated he wanted to go to the compound, that he was tired of doing his time in SHU and he was "not afraid of no Mexican Mafia or Sureños dudes." [146-2, p. 3]

Alba also refers to a November 5, 2007 request that he be transferred from USP Big Sandy, KY, where he was incarcerated from May 4, 2007 to December 3, 2007, which states that Alba "has a [Central Inmate Monitoring (CIM)] assignment of separation and separation from the disruptive group Texas Syndicate."  Alba was assaulted at FCI Yazoo City by members of other gangs – Paisa, Sureños and Border Brothers.  [1-3, p. 6]   Despite his previous problems in Texas state prison,[6] and the 2007 threat assessment conclusion that he probably could not be safely placed in any federal or state facility in the state of Texas, Alba specifically requested assignment to the federal facility at Three Rivers, Texas.  [1-3, p. 3].  Instead, on January 7, 2008, the BOP assigned him to FCI Yazoo City, Mississippi.  [66, Ex. 2, p. 1]

Alba alleges Delores Randle and her supervisor Mike Morris violated his constitutional right to be protected from attack by fellow inmates because they had access to the information in his prison file, and failed to protect him from the attack at Yazoo City.  Randle is a Case Manager at FCI Yazoo City, and as such, she is "responsible for collecting, interpreting and evaluating factual information reflecting developmental and circumstantial factors" for those inmates in her case load, and for implementing, monitoring and managing treatment plans for each inmate assigned to her.  She does not make decisions as to where the inmate is placed on the compound.  Alba was assigned to Randle's case load.  From January 2008 until July 2008, Alba

---

[5]An exhibit to Alba's complaint indicates he was assaulted by Texas Syndicate members in November 1998 while he was in a Texas state prison, and that he was placed in administrative segregation  protective custody in July and August 1999.  [1-3, pp. 29-31)

[6]Alba was apparently first attacked by fellow inmates in July 1999, while he was in a Texas state prison. [1-3, pp. 29-34]

3

was on the compound without any known problems, and before the assault on July 26, 2008, Randle was unaware that Hispanic gangs had targeted Alba, or that there was any substantial risk to Alba's safety.[7]  According to Randle, Alba's central file contained no information regarding any "hit on site" on Alba.  [66, Ex. 5]

Mike Morris was the Unit Manager of the unit to which Alba was assigned at Yazoo City.  According to his Declaration, Morris is responsible for administration, direction and management of a housing unit; he is the supervisor of unit team members responsible for developing treatment programs to meet the needs of inmates in the unit.  He is not responsible for review of Central Inmate Monitoring and does not make decisions regarding an inmate's placement on the Yazoo City compound.  He, too, notes that Alba was on the compound from January 2008 with no known problems, and stated he had no knowledge before the July 26, 2008 assault on the recreation yard, that Hispanic gangs posed a threat to Alba.  [66, Ex. 4]  Morris also states that Alba's central file contained no information that Hispanic gangs had a "hit on site" order on Alba.

Alba alleges Bruce Pearson, Warden of FCI Yazoo City since January 2008, is responsible for the actions of Randle, Morris and all BOP administrators.  Pearson's declaration establishes that he personally made no decisions regarding Alba and had no personal involvement in Alba's CIM classification, his separations, his initial designation or re-designations or his placement in general population at Yazoo City.  [66, Ex. 11]  The only act Alba attributes to Pearson is that three months *after* Alba was assaulted, Pearson signed the October 14, 2008 request to have Alba transferred from Yazoo City to another facility.

---

[7]Alba is also Hispanic.

Alba's claim of failure to protect against Special Investigative Services (SIS) Federal Gang Intelligence Lieutenant Debra Dawson and Officer Jeremy Fuqua is that they should have immediately placed Alba in the Special Housing Unit (SHU) protective custody lock-down upon his arrival at Yazoo City because they had access to the 2007 threat assessment and knew there were Sureño gang members at Yazoo City.  Actually, Alba *was* placed in SHU immediately upon his arrival.  Dawson's declaration establishes that when Alba arrived at Yazoo City on January 7, 2008, he was placed in SHU, pending review regarding his security threat group (STG) assignment of Texas Syndicate associate or suspect.  Alba was released to general population only after his interview by Lt. Dawson, wherein Alba denied any association with the Texas Syndicate and explained his tattoos had nothing to do with gang affiliation, but just reflected that he hailed from Texas.  Alba was instructed that if he had any problem in the general population, he could report to any staff member that he was in danger and he could request protective custody placement in SHU.  Alba was released into the general population on January 8, 2008, where he remained without incident for some six and one-half months.

On July 26, 2008, fellow inmates attacked Alba.  When the assailants were not identified through upper body checks, the prison staff reviewed video tapes to identify them.  During her investigation of the attack, Dawson interviewed the assailants identified, as well as Alba.  [66, Ex. 6]  According to Dawson, Alba told her he knew he was going to be assaulted, that a fellow inmate warned him that he was going to be assaulted and he should check himself into SHU, and that he (Alba) responded by telling the inmate he would never check himself into SHU; that it would take at least three other inmates to take him off the compound.  Alba chose, instead, to position himself in an area covered by cameras just before the assault.  Dawson states Alba told

5

her the assault resulted from his angering Hispanic members of the Paisa, Sureños and Board (*sic*) Brothers gangs by telling them they would no longer be checking tattoos to determine gang affiliations of new inmates; that he (Alba) wanted Texas inmates to stand up to the Paisa inmates, to show they were not afraid of the Paisa.  Alba's assailants confirmed the reason for the assault, telling Dawson it was precipitated by Alba's trying to cause problems between the Texas inmates and the Paisa, to get them to fight each other. [66, Ex. 6]  Alba denies making these statements to Dawson.

      Jeremy Fuqua is a BOP correctional officer, who serves as the Urinalysis/SIS Officer at Yazoo City.  He responded to the scene of Alba's assault on July 26, 2008 and assisted in performing upper body checks on inmates, and reviewing video to identify the assailants.  Other than that, his only involvement with Alba was for monthly urinalysis drug testing from February to June 2008.  According to Fuqua's Declaration, he has never been a "gang intelligence officer" at Yazoo City or with the BOP, and had no prior access to SIS files, Central Inmate Monitoring data or similar information, or to an inmate's central file. [66, Ex. 12]

      From April 2007 until January 2010, Delbert Sauers was Chief, Designation and Sentence Computation Center (DSCC) of the Federal Bureau of Prisons in Grand Prairie, Texas.  He held this position when Alba was designated to FCI Yazoo City in January 2008. Alba asserts Sauers failed to protect him by negligently, and "with deliberate indifference and reckless disregard" transferring him to Yazoo City where there were gang members who attacked him.  Sauers' declaration establishes that he supervised the Section Chief over Classifications and Designations, who in turn supervised the Operations Manager for Hotel Team whose staff

6

designators performed initial designations[8] and re-designations (transfers) for BOP inmates. Sauers did not designate or transfer inmates, but was a "third-line supervisor of the DSCC designators who made these decisions." Sauers did not designate, transfer, review a transfer, or personally deny any recommendation regarding Alba or make decisions about Alba's placement in general population, his CIM classification, separations, designations. [66, Ex. 3]

Since February 2008, Ayanna Brown has been a U.S. Department of Justice Investigator in the Special Litigation Section, Civil Rights Division in Washington, D.C. The Special Litigation Section protects constitutional and federal statutory rights of persons confined in state or locally owned or operated facilities such as those for the mentally ill and developmentally disabled, nursing homes, juvenile correctional facilities and adult jails and prisons. In June 2007, while Brown was a contract paralegal in the Division, she received a complaint from Alba who was then imprisoned at USP McCreary, in Pine Knot, KY. [1-3, p. 23] Since Alba was in a federal penitentiary, and since Brown had no authority to investigate Bureau of Prisons actions, she referred the complaint to the Federal Bureau of Prisons on June 29, 2007. [66, Ex. 13] According to the complaint Alba sued Brown because she failed to follow up on the BOP's investigation of his 2007 complaint.

## STANDARD

Because Defendants have submitted matters outside the pleadings with their motion to dismiss or alternatively for summary judgment, the motion will be considered as one for summary judgment. *See* Fed. R. Civ. P. 12(b); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir.

---

[8] Designation is the term used for the decision as to the BOP facility at which an inmate will serve his sentence. [66, Exhibit 3]

7

1991). The Court must view the facts in a light most favorable to the Plaintiff, and may grant summary judgment only if Defendants demonstrate that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995). The Court must deny summary judgment if Defendants fail to discharge the burden of showing the absence of a genuine issue concerning any material fact. *John v. Louisiana,* 757 F.2d 698, 708, 712 (5th Cir. 1985). Whether an issue of material fact exists is a question of law for the Court to decide, drawing inferences "most favorable to the party opposing the motion, and [taking] care that no party will be improperly deprived of a trial of disputed factual issues." *Id.*

## ANALYSIS

Plaintiff filed his complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and 28 U.S.C. § 1331. A *Bivens* action is analogous to a civil rights action brought under 28 U.S.C. § 1983, the only difference being that *Bivens* applies to alleged constitutional violations by federal actors, rather than state officials. *See Izen v. Catalina*, 398 F.3d 363, 367 n.3 (5th Cir. 2005). "*Bivens* extends the protections afforded by § 1983 to parties injured by federal actors." *Muzzi v. U.S. Government*, 2002 WL 922378 at *1 (E.D. La. May 6, 2002). Defendants' motion seeks dismissal of Alba's lawsuit on grounds that the Court lacks personal jurisdiction over Sauers and Brown; that Alba failed to exhaust administrative remedies; and that all Defendants are entitled to qualified immunity. In his response to the motion, Alba states as to Defendants Ayanna Brown and Jeremy Fuqua, that he "voluntarily dismisses his claims against these two defendants [with his deepest apologies] ..." [78, p. 76], [85, p. 4]. For that reason, as well as the reasons which follow, the undersigned recommends that Alba's complaint as to Defendants Brown and Fuqua be dismissed.

<u>Lack of Jurisdiction over Sauers and Brown</u>

Defendants urge that Sauers and Brown should be dismissed from this action for lack of personal jurisdiction. Plaintiff responds that Sauers was deliberately indifferent and recklessly disregarded Plaintiff's Eighth and Fourteenth Amendment[9] rights by "failing to take corrective action to correct broken/faulty BOP and/or DSSC policies" which resulted in Alba's being designated to FCI Yazoo City. [78, p. 62] As a matter of law, Alba has no Fourteenth Amendment claim as the Fourteenth Amendment applies only to state actors, not federal employees/actors. *See*, *McGuire v. Turnbo*, 137 F.3d 321, 323 (5th Cir. 1998).

"[A] *Bivens* action may be maintained against a defendant only in his or her individual capacity, and not in his or her official capacity." *Pollack v. Meese*, 737 F. Supp. 663, 666 (D. D.C. 1990); *see also Gibson v. Federal Bureau of Prisons*, 121 Fed. Appx. 549, 551 (5th Cir. 2004). Since there is no evidence that either Sauers or Brown resides in Mississippi, before the Court can exercise personal jurisdiction over these Defendants, Plaintiff must show that they purposely directed activities toward Mississippi or purposely availed themselves of the privileges of conducting activities in this state, and that Plaintiff's cause of action arose out of or resulted from Sauers' and Brown's forum-related contacts. *Nuovo Pignone, v. Storman Asia M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). The undersigned is of the opinion that Alba has failed to meet his burden of showing Sauers and Brown have sufficient "minimum contacts" with Mississippi to establish personal jurisdiction.

---

[9]As a matter of law, Alba has no Fourteenth Amendment claim as the Fourteenth Amendment applies only to state actors, not federal employees/actors. *See*, *McGuire v. Turnbo*, 137 F.3d 321, 323 (5th Cir. 1998).

Other courts have held insufficient to establish personal jurisdiction mere allegations relating to a BOP official's decisions regarding an inmate's administrative appeals outside the forum state and other supervisory activities over a facility outside the forum state. *See Murrell v. Chandler*, 2007 WL 869568, at *4 (E.D. Tex. March 21, 2007) (granting defendants' motion to dismiss Harrell Watts for lack of personal jurisdiction, stating that "plaintiff's allegations that Watts decided his administrative appeals outside the state of Texas is not sufficient contact to support a finding of personal jurisdiction"); *Jones v. Hawk-Sawyer*, 2000 WL 34203850, at *2 (N.D. Tex. Oct. 19, 2000) (dismissing claim against BOP official for lack of personal jurisdiction, holding that "Plaintiff's allegations that Hawk-Sawyer decided two administrative appeals outside the state of Texas and his conclusory allegations of conspiracy are not sufficient contact to support a finding of personal jurisdiction"); *Hill v. Pugh*, 75 Fed. Appx. 715, 719 (10th Cir. 2003) (dismissing claims against BOP officials for lack of personal jurisdiction, holding it was "not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state"); *see also Durham v. Lappin*, 2006 WL 2724091, at *5 (D. Colo. Sept. 21, 2006) (dismissing claim against Harrell Watts and other BOP officials for lack of personal jurisdiction, holding allegations that they signed off on denials of plaintiff's grievances insufficient to show that they purposely availed themselves of the benefits of the forum state). The Court finds the reasoning in these cases persuasive, and finds Plaintiff's allegations fail to sufficiently establish that this Court has personal jurisdiction over Sauers and Brown. Furthermore, the evidence before the Court establishes that Sauers had no personal involvement in designating Plaintiff to FCI Yazoo City, and Brown had no authority to oversee the BOP's investigation of the complaint

she received from Alba and forwarded to the BOP.  Brown cannot be held liable for failing to do something she had no authority to do, and supervisory liability does not lie against Sauers, as there is no doctrine of *respondeat superior* in *Bivens* actions.  *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998).  This authority supports dismissal of Warden Pearson, as well, since Alba's claim against Pearson is one for supervisory liability.  Although Alba responds to the present motion stating Pearson and Morris also failed "to take corrective action to correct broken/faulty BOP and/or DSSC policies" which resulted in his designation to Yazoo City [78, pp. 63-64], he has presented no evidence to show any of these Defendants had authority to take such action.

Exhaustion of Administrative Remedies

There is no question that exhaustion of administrative remedies is mandatory under the Prison Litigation Reform Act (PLRA), and that unexhausted claims cannot be brought in court. *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006).  Failure to exhaust is an affirmative defense on which the Defendants bear the burden of proof.  In support of their contention that Alba failed to exhaust administrative remedies, Defendants present the Declaration of Glenda Dykes, BOP Legal Instruments Examiner in the Southeast Regional Office in Atlanta, Georgia.  Ms. Dykes serves as the Administrative Remedy Clerk for the Southeast Region, and is responsible for processing inmates' administrative remedy requests sent to the Southeast Regional Office. [66]  Alba's claim that he has exhausted his administrative remedies by filing administrative remedy numbers 535253-F1, 525253-R1, 525352-A1, 579098-R1 and 579098-A1 is refuted by Dykes, and by Alba's BOP records [66], which show that while Alba did file those administrative remedies, he failed to present them to all three levels of the administrative review process which is required

for exhaustion. 28 C.F.R. § 542.10, *et seq.* From the evidence before the Court, it does not appear that Alba exhausted his administrative remedies.

## Qualified Immunity

Government officials performing discretionary functions enjoy qualified immunity from suit in civil actions for damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The defense is available in any suit for damages for alleged violations of the Constitution. When an official pleads qualified immunity and shows he is a government official whose position involves the exercise of discretion, the burden shifts to the plaintiff to rebut the qualified immunity defense by establishing the violation of clearly established law. *Pierce v. Smith*, 117 F.2d 866, 871 (5th Cir. 1997) To determine whether Defendants are entitled to qualified immunity, the Court must consider (1) whether the official's conduct violated a constitutional right, and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the official's conduct did not violate a constitutional right, the inquiry ends there. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id*.

## Failure to Protect

Alba has alleged that the Defendants failed to protect him from being attacked by other inmates on July 26, 2008. The Eighth Amendment imposes a duty on prison officials "to protect inmates from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 1979 (1994). A *Bivens* claim for failure to protect requires proof of the same

elements as a § 1983 claim for failure to protect, *i.e.*, that Plaintiff was "incarcerated under conditions posing substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998). To act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference." *Neals v. Norwood*, 59 F.3d 530 (5th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994)). A prisoner can make a prima facie case under this standard by showing "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the [official] sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842. Mere negligent failure to protect a prisoner from attack does not justify liability. *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

In this case, the FCI Yazoo City Defendants deny they had knowledge of threats made against Alba by the Hispanic gangs who assaulted him at Yazoo City. Randle, Morris, Pearson and Fuqua had no personal involvement in the decision to place Alba on the compound; Fuqua did not even have access to Alba's SIS or central files or CIM data.[10] Although Alba states in his response that he remarked to Randle and Pearson that Hispanic gangs were making threatening statements against ex-gang members from Texas, there is neither evidence before the Court nor any allegation that Alba ever told officials at FCI Yazoo City that he feared for his safety or that he feared he would be assaulted. [78, pp. 64, 68-69] Indeed, he was on the compound for well

---

[10]As previously noted, Alba has voluntarily dismissed his claims against Fuqua.

over six months without incident before he was assaulted. Alba predicates liability of the FCI Yazoo City officials on the existence of information in his prison file indicating a threat to his safety, *e.g.* the 2004 report from USP Coleman in Florida, and the 2007 threat assessment from USP Hazelton based on Alba's admitted membership in the Texas Syndicate. Alba denied any association with Texas Syndicate in his interview upon arrival at FCI Yazoo City. In addition, the investigation of the circumstances of Alba's FCI Yazoo City assault indicates Alba was not attacked based upon some preexisting threat, but because of his conduct after he arrived at the facility.

      Lt. Dawson reported that Alba told her he knew he was going to be assaulted on the morning of July 26, 2008 because he was trying to get Texas inmates to stand up to Hispanic gangs, and that he decided to position himself in an area covered by cameras so the assault would be documented. It is undisputed that the assault was covered by cameras, and that it was the video from the cameras which led to identification of some of the perpetrators. The investigative report summarizes the statements of fellow inmates that the assault resulted from Alba's generating tension among prison gangs and attempting to get them to fight each other. While Alba emphatically denies trying to pit prison gangs against each other, he does not directly deny knowing the assault was forthcoming. Instead, he states prison video would show that when the assailants came at him, he ran toward the correctional officer at the recreation yard. [78, p. 71] Alba claims the Hispanic gangs wanted him to inspect tattoos of incoming inmates to determine their gang affiliations, but he refused to do so. [78, p. 74], [85, p. 2] He does not state that he perceived this as a threat to his security or ever conveyed the information to any prison official, or that he ever requested protection at FCI Yazoo City.

The Court notes that much of Alba's responsive pleadings is dedicated to his complaints regarding conditions of his present confinement in South Carolina. Since this Court has no jurisdiction over the prison officials in South Carolina, it will not address those complaints.

While Alba has alleged a constitutional violation, the undersigned is of the opinion that he has failed to present evidence to establish facts showing that Yazoo City prison officials knew of and deliberately ignored any specific threat to his safety. Although Defendants have asserted qualified immunity, "if it becomes evident that the plaintiff has failed ... to establish a claim, then the [defendants are] entitled to dismissal on that basis. *Wells v. Bonner*, 45 F.3d 90, 93 (5th Cir. 1993) (citing *Siegert v. Gilley*, 500 U.S. 226, 231-233 (1991). However, even if Alba were deemed to have established a cognizable constitutional claim, the undersigned is of the opinion that the Defendants would be entitled to qualified immunity as their actions were objectively reasonable in placing Alba in SHU upon his arrival at Yazoo City, interviewing him about his threat assessment group and being advised by him that he was not associated with the Texas Syndicate. Alba was not released into general population until after the interview. The reasonableness of the Defendants actions is further evidenced by the fact that nothing happened to Alba for over six months, and the assault which ultimately occurred was related to, and precipitated by, Alba's conduct after he arrived at Yazoo City rather than some preexisting threat.

## **RECOMMENDATION**

For the reasons stated above, the undersigned recommends that Defendants' motion for summary judgment be granted; that Defendants Sauers and Brown be dismissed for lack of personal jurisdiction, Sauers to be dismissed without prejudice, but Brown with prejudice as Plaintiff has voluntarily dismissed his claim against her; that Defendant Fuqua be dismissed with

prejudice as Plaintiff has voluntarily dismissed his claim against him; and that the claims against Randle, Morris, Pearson and Dawson be dismissed with prejudice for Plaintiff's failure to present evidence showing a genuine issue of material fact that these Defendants knew of and were deliberately indifferent to a substantial risk of serious harm to Plaintiff prior to Plaintiff's assault by fellow inmates on July 26, 2008.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Rule 72(a)(3), *Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi*, after service of a copy of this Report and Recommendation, each party has fourteen days to serve and file written objections to the Report and Recommendation. A party must file objections with the clerk of court and serve them upon the other parties and submit them to the assigned District Judge. Within seven days of service of the objection, the opposing party must either serve and file a response or notify the District Judge that they do not intend to respond to the objection.

An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects; the District court need not consider frivolous, conclusive, or general objections. A party who fails to file written objections to the proposed findings, conclusions, and recommendations within fourteen (14) days of being served a copy shall be barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion accepted by the District Court to which he did not object. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Signed, this the 24th day of June, 2011.

/s/ *Robert H. Walker*
ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE